GREGORY *et al. v.* BOSTON SAFE-DEPOSIT & TRUST CO. *et al.*

(*Circuit Court, D. Massachusetts.* October 5, 1888.)

1. PLEDGE—CONVERSION—ESTOPPEL.
   Plaintiff, to raise money for a business enterprise, caused notes of his debtor to be made payable to B., who, with plaintiff's consent, gave them to J., to be used to raise money by either B. or J. for that purpose; they both being associates of plaintiff. J. exchanged the notes for others payable to himself, and one of these B. pledged to obtain the necessary funds. There was a conflict of evidence as to whether plaintiff authorized this pledge, as made, but he apparently acquiesced in it for months after learning of it, and it was only when the venture proved unsuccessful that he expressed dissatisfaction with B.'s action. *Held* that, as against the pledgee, who was an innocent purchaser for value, plaintiff was estopped from claiming the proceeds of the note.

2. ARBITRATION AND AWARD—SUBMISSION—NON-JOINDER OF PARTIES.
   A submission to arbitration of a pending suit, without the consent of all the parties thereto whose interests may be affected by the award, is irregular and void.

**3. SAME—REVOCATION—DEATH OF PARTY BEFORE FINAL AWARD.**
Where an arbitrator makes an award, which does not purport to be final, and before such final award one of the parties dies, the death will operate as a revocation of the submission.

In Equity.
Bill by Charles A. Gregory and Charles F. Jones against the Boston Safe-Deposit & Trust Company, and the Merchants National Bank, and Mary H. Pike, administratrix of Frederic A. Pike, deceased, to obtain the amount of a judgment on deposit with said bank and trust company, said judgment being founded on a note claimed to be the property of complainants.

*F. A. Brooks*, for complainant.
*John Lowell* and *T. H. Talbot*, for defendant Mary H. Pike.
*L. S. Dabney*, for defendant Merchants National Bank.
*Solomon Lincoln*, for defendant Boston Safe-Deposit & Trust Company.

COLT, J. In 1881, George W. Butterfield sold certain mining property to Frederic A. Pike, of Calais, Me. Early in 1883, Butterfield became desirous of getting the same property back again. He associated himself with one Charles F. Jones. A contract of purchase was made with Pike, January 29, 1883, and Jones made the first cash payment under it. Shortly after this, Butterfield and Jones entered into negotiations with the plaintiff Charles A. Gregory and J. C. Kemp van Eé, as persons who could help furnish the requsite means to carry out the contract with Pike. To raise the money, Gregory and Kemp transferred to Butterfield 160,000 shares of the Great Sierra Consolidated Mining Company. These shares Butterfield, early in April, 1883, sold to W. C. N. Swift, of New Bedford, Mass., receiving $10,000 in cash, and four notes, amounting to over $80,000. These notes were made payable to the order of Butterfield, and were negotiable. On April 9th, two of these notes were delivered by Butterfield to Gregory, and on the same day Gregory passed the notes back again to Butterfield, who delivered them to Jones, as Butterfield, Gregory and Kemp sailed that day for England, to look after the sale of the mining property covered by the contract of purchase with Pike. On April 20th, Jones surrendered to Swift the four negotiable notes, and took in return from Swift five other notes, payable to the order of Jones, three of which were non-negotiable. It is one of these latter notes, amounting to $20,334.60, which is in controversy in this suit. Under the contract with Pike it became necessary to sell the property before July 30, 1883. This was not accomplished, and Butterfield, who had returned from Europe, went with Jones to Calais, and on July 31st made a second contract with Pike, extending the time for selling the property to January 1, 1884. The body of this agreement called for a cash payment of $25,000, but there was appended at the end of the paper the following modification:

"For the first payment of $25,000, specified in the above agreement, the said Butterfield has lodged in the hands of said Pike the notes of W. C. N. Swift, of New Bedford, dated April 20, 1883, for $15,000 and $20,334.60,

payable in two and three years from date, which notes are to be held by said Pike until January 1, 1884, unless sooner redeemed by said Butterfield by the payment of $25,000, and at that time the said Pike is authorized to raise $25,000 out of them by pledging them on the most favorable terms he can obtain."

In December, 1884, Gregory brought suit against Pike and Swift in the state court of Massachusetts for the possession of these notes. This suit was removed to the circuit court of the United States in 1885, and is No. 2,170 of causes in equity. Subsequently the court allowed Kemp and Butterfield to become parties to the suit. Under a stipulation dated November 13, 1886, Gregory and Pike, through their respective counsel, submitted the questions raised in the equity suit to the Hon. E. R. HOAR, for determination. The award of Judge HOAR purports to be dated November 30th, the time of the submission, though the date when the award was made appears by the evidence to have been December 20th. He found the plaintiff Gregory entitled to the two Swift notes upon the payment of a certain note for $2,437.50, signed by Butterfield and Jones, and payable to the order of C. H. Eaton. At the time of the negotiation of July 31st with Pike, it became necessary to free the mining property of a mortgage to Eaton. Pike agreed to hold the Swift notes as collateral for the payment of the note given Eaton, as well as for the payment of the $25,000 called for by the contract. In consideration of this note, and acceptance by Pike, Eaton discharged his mortgage on the property. Pike died December 2, 1886, and Mrs. Pike became executrix under his will. On December 24, 1886, through her attorney, E. B. Harvey, she notified Judge HOAR that she revoked the submission made to him as arbitrator, and on the same day the two Swift notes were surrendered by the referee, and passed into the hands of John G. Stetson, clerk of the circuit court, to be dealt with as the counsel for Gregory and Mrs. Pike might jointly direct. In April, 1886, an action at law was brought against Swift in the name of Charles F. Jones, the nominal payee, on his note for $20,334.60. Judgment was obtained, and the amount of $24,926.90 was paid into court in full satisfaction of the judgment and interest thereon, and the note canceled. By order of the court, January 10, 1887, this amount was transferred to the equity cause of *Gregory* v. *Pike*, pending in this court. The present suit is brought by Gregory and Jones against the Boston Safe-Deposit & Trust Company, and the Merchants National Bank, where the money derived from the Swift judgment was deposited, and also against Mrs. Pike; and the bill prays that the funds in said banks may be paid over to the said Gregory.

The first point we have to decide is whether the submission to Judge HOAR is binding upon the parties to it. There is one objection taken, which is fatal to this award. The submission purports to be a submission of the equity cause then pending in the United States circuit court, and that cause is referred to, and of necessity made a part of, the submission. In that cause there were other parties besides Gregory and Pike, and a submission, whether by rule of court or otherwise, without

the assent of these other parties, whose interests might be affected, was irregular and void. "If a submission be entered into in a pending cause, or if a reference is undertaken to be made by agreement of parties, all persons who are parties of record to the suit must unite equally whether they are mere nominal parties or really interested." Morse, Arb. 33; *Owen* v. *Hurd,* 2 Term R. 643; *McCarthy* v. *Swan,* 145 Mass. 471, 14 N. E. Rep. 635. Again, Mr. Pike died pending submission which would ordinarily operate as a revocation. "The most familiar case in which it (revocation in law) takes place is where one of the parties dies pending the arbitration. As a general rule, this occurrence is a revocation of the arbitrator's authority." Morse, Arb. 233; *Marseilles* v. *Kenton,* 17 Pa. St. 238; *Dexter* v. *Young,* 40 N. H. 130. On December 24th Mrs. Pike gave formal notice to Judge HOAR that she revoked the submission. While Mr. Brooks, as representing Gregory, was anxious to obtain some kind of an award from Judge HOAR after he expressed his opinion orally on December 18th, yet, upon the evidence, it would seem that the arbitrator was to hear counsel further; and it may well be doubted whether he intended to make any final award before the notification of December 24th. He seemed anxious, rather, to surrender the papers on the ground that, after what had taken place, his work would not do the parties any good; and the notes in fact, it will be remembered, were surrendered to counsel for both parties, and by them lodged in Mr. Stetson's hands. Upon this state of facts I do not think the submission binding upon either party.

We come now to the merits of the controversy, and the first question is whether Pike's estate, as against Gregory, has any interest in this Swift note, or its proceeds now in the registry of the court. Gregory contends, in the first place, that he is entitled to the note, because neither Butterfield nor Jones had any authority to pledge it to Pike; and, second, that if they did have authority to pledge, Pike, by his failure to carry out the terms of his contract, has lost whatever rights he may have had. With respect to the first proposition, I do not think that, as against Pike, an innocent pledgee for value, Gregory can claim ownership of this note. Gregory, Butterfield, and Jones were engaged in a joint undertaking to sell on the London market the mining property contracted for with Pike. Pike's first contract with Butterfield was in January, 1883, and the contract of July 31st was a renewal upon different terms. In the spring of 1883, in furtherance of this scheme, Butterfield sold for Gregory and Kemp certain mining stock to Swift, who paid for the same in cash and notes. These notes were negotiable, and were made payable to the order of Butterfield, and Gregory passed over his two notes to Butterfield. It became necessary now to raise some money on the Swift notes, and so they were passed over by Butterfield to Jones for that purpose, with the consent of Gregory. Jones saw Swift, and exchanged these notes, together with the two belonging to Kemp, for five other Swift notes, payable to Jones, three of which were non-negotiable. It is one of the latter notes which is now in controversy. From Gregory's own statement it seems he did not know Jones had ex-

changed the original Swift notes which were negotiable for others which were not, and therefore he must have believed that Butterfield or Jones had the power to dispose of them to Pike, if they found it necessary. The fact that Butterfield on August 4th cabled Gregory, asking if he should use the note, and that Gregory replied that his interest must be increased if the note was used, the reply by Jones that they must adhere to original contract, and the subsequent answer by Gregory forbidding use of note except his interest should be increased, cannot, it seems to me, change 'the position of an innocent party like Pike, in view of the whole situation, and of the subsequent conduct of Gregory. Butterfield swears that, before leaving London, Gregory, being a partner with him, gave him authority to use the Swift note if it should become necessary, but to cable him before doing so; that it did become necessary, and therefore he used the notes. This authority Gregory denies. Jones swears that, on returning to London in August, he told Gregory just what had been done, and that he also agreed to give Gregory $100,000 out of his individual interest in the sale of the mining properties if he would give his hearty co-operation in prosecuting the sale. Gregory denies that Jones told him the details of the contract of July 31st, but he admits that he told him that he would give him $100,000 of stock in the May Lundy Company, if (quoting:)

"I would take the same in satisfaction oʌ their having made use of the Swift note, or notes with Pike, in that connection; but I refused to take it, and refused to ratify the use of the note or notes."

He further says.

"He (Jones) told me that if the May Lundy sale did not succeed, that the note was to be given up by Pike. I did not learn what one of the Swift notes had been put up, and I did not know that the original notes had in any way been changed. I was left to suppose that such notes as had been used was one or some of the original Swift notes."

On August 21st, Gregory's brother writes him from Boston as follows:

"In my last or previous letter I wrote you that Butterfield had not given up to me (nor Frank) any note whatever. He said that you told him he could use it in arranging with Pike; and on his return from Maine he told me that he had put it up as collateral with Pike; but that it could be obtained, if you did not approve. He then went to California, and said Jones would go to London, and see you the next week."

· It thus appears that Gregory knew, by the first week in September at latest, that the Swift note or notes had been put up as collateral with Pike under the agreement of July 31st. What course does he now pursue? Does he immediately inform Pike that Butterfield had no authority to pledge the notes? The evidence goes to prove that during the fall months Gregory and Jones were engaged in London in prosecuting to a successful issue the sale of this property, and that it was not until the following December,—and after, as Jones swears, an expert had made an unfavorable report of the property, so that the sale in London fell through,—that Gregory became dissatisfied, and demanded of Pike a return of the notes. Upon this state of facts it would clearly be inequita-

ble to permit Gregory to repudiate the contract made with Pike. He held Butterfield out to the world as the owner of the Swift notes, which were pledged to secure the success of a joint enterprise. He allowed Butterfield to deal with an innocent party as the owner of these notes, in furtherance of their joint interests. His conduct shows that he was satisfied to have the Swift notes pledged as collateral, if the joint enterprise proved a success; but, if it proved a failure, it was then his purpose to repudiate Butterfield's act, and demand a return of the notes. He is estopped by his acts from repudiating the pledge Butterfield made to Pike.

The remaining question is whether Pike has forfeited his right to the notes under the contract of July 31st. The contract provides that, in case the Union Trust Company, who were to hold the deeds of the property in trust until January 1, 1884, declined to deliver the bonds of the May Lundy Mining Company to Butterfield under the agreement, it should be void, and the money returned to Butterfield; and, further, that the action of the trust company was to be ascertained and reported to Pike within 30 days from the date of the agreement. While the evidence is somewhat conflicting, I do not find, taking all that is in the record bearing upon this point, either that the trust company declined to deliver the bonds, or that any notice was sent to Pike. Under the contract Butterfield was to pay $25,000 at the time of the agreement, and the remainder of the purchase money, $217,266, on or before January 1, 1884; and "in case the payments are not made, as above stated, on the first day of January next, the sums of money which shall previous to that time have been paid under this agreement  *   *   *  shall be forfeited." Appended to the end of the contract is the provision that, for the first payment of $25,000, Butterfield has lodged in Pike's hands the two Swift notes, which notes Pike was to hold until January 1, 1884, unless sooner redeemed by Butterfield on payment of $25,000, and at that time Pike was authorized to raise $25,000 out of them by pledging them. The fair construction of this provision is that Pike held these notes as collateral security for the first payment under the contract. The contract failed, not by reason of any default on the part of Pike, but by the default of Butterfield. The contract provided, in case of Butterfield's failure, he should forfeit all payments before made, including, of course, the first. In place of the first cash payment something else was substituted, which he was to hold as security for that payment until a certain time, and then, if the $25,000 was not paid, he had power to pledge the security to raise the money; that is, he was then authorized to pledge. It does not seem to me a proper construction, or one in accord with the intent of the parties, to hold that Pike was obliged to pledge these notes immediately, or within a reasonable time after January 1, 1884, or lose his lien. He was empowered to do so if he chose; but, if he deemed it best for the interests of all not to pledge the notes, or found it impossible to raise the money on them, he would not thereby lose his lien upon them. The fair reading of this provision is that Pike was provided a way by means of which he might realize his $25,000 if the notes were

not redeemed by January, 1st; not that he was obliged to pledge them at that time or forfeit all right to them. In my opinion, upon the evidence now before me in this case, Mrs. Pike, as executrix, has a lien on the Swift notes or their proceeds, to the extent of $25,000, but the decision of this question belongs to equity suit No. 2,170, where all persons claiming an interest in these notes are made parties. The moneys in the possession of the defendants the Boston Safe-Deposit & Trust Company and the Merchants National Bank, referred to in the bill of complaint herein, are held by them subject to the orders of this court in said equity suit No. 2,170; and no orders relating to said moneys can properly be made in this suit, which does not include as parties some of the persons who are parties in said equity suit No. 2,170. The bill in this case should be dismissed, with costs.